And we begin with United States v. Flirt, Ms. Shepard. May it please the Court, Katie Shepard for Mr. Ronald Flirt. The evidence in this case was insufficient and the Court should remand for entry of a judgment of acquittal. Alternatively, the Court should remand for a new trial, either because the government elicited improper testimony from all of its witnesses, or because Mr. Flirt was denied his constitutional right to present a complete defense. The only disputed element at trial was the intent to distribute, but no rational jury could find that element beyond a reasonable doubt for two reasons. I mean, that's a pretty stiff standard for you. I mean, why do we have jury trials if it's not to decide things like this? There was evidence both ways, right? There were no evidence of distribution in terms of this Court's prior cases and those hallmarks of distribution. There were only tools of use in this case. So we had two people who were in a truck with… Well, you had the quantity, which a jury can judge either way. You had the fact of the packaging. This is not a no-evidence case. You're not contending this is a no-evidence case? Not a no-evidence case, and that isn't the standard. But for example, in the Ganji case, this Court has talked about how the inferences need to be warranted. And in this case, there wasn't a warranted inference of intent to distribute. But counsel, didn't the defendant testify in this case and explain what had happened and present it to the jury, his version of why he and the other person were there and why the drugs were in the amounts they were? He did testify in this case, and the defendant also testified in the Hunt case, where this Court found insufficient evidence. And in that case, there also was testimony from a detective that the quantity of drugs was a distributable amount. But this Court found that there was insufficient evidence. In that case, there weren't actually any smoking devices like pipes like there were in this case. And there was a razor blade there where there was testimony that that was necessary to cut the drugs for distribution. And there also was a firearm, which is a classic tool of the drug trade. But the Court still found that there was insufficient evidence in this case. And I would argue that there's even less evidence of distribution here because we have two people in a truck with two pipes that there was testimony or used to smoke meth. There were ledgers or scales or a firearm. There wasn't a large amount of cash. The agents testified that it was below the threshold for seizure, so they didn't bother to count it. So with all of that evidence of use and none of those hallmarks of distribution, the evidence was not sufficient for the jury to make that inference based on the quantity. I would also add that with this Court's other cases where quantity came into play, oftentimes the quantity was much larger than it was in this case. Sometimes it was 500 grams or a backpack full of marijuana, something that's so obviously not personal use. How did the trial judge handle this problem of allocating evidence, et cetera? How was the jury instructed? The jury was instructed with the Fifth Circuit's pattern instructions about possession, joint possession, and then the elements of the offense that they had to find an intent to distribute as one of the elements for both the possession with intent to distribute and the conspiracy. So there weren't any unusual instructions, just the pattern instructions. Did the defendant request any special instructions to deal with this problem of common possession versus distribution? No, the defense also did not request any special instructions. Everyone agreed to the pattern instructions. What did the defendant argue to the jury? That it wasn't for distribution, it was personal use, and that there weren't any of these hallmarks of distribution, no scales, no ledgers, no firearms, small amount of cash, similar arguments to what I'm making. But I would say that even though there was some evidence, there was not sufficient evidence to find beyond a reasonable doubt. Also, in this case with the purity, that's something that was emphasized in the government's brief, but the jury wasn't actually given any evidence to draw conclusions about the purity and what the significance was. In other cases, there's been, for example, in Prieto Tejas, there was evidence that the DEA agent testified that the typical amount or the average amount of purity on the street for cocaine was 25%, and the defendant in that case had 82% pure cocaine. Or in another case, there was a very dramatic difference in purity levels between two bags that weighed 33 grams and had in the 80s percent purity and then 15 smaller bags that had 35% purity. So in this case, the government didn't give the jury any evidence about the significance of the purity levels, and so that doesn't allow the jury to make a rational inference of an intent to distribute. And also with the Santa Muerte statute that came up, or statute that came up, again, the government didn't give this jury any evidence about that being for protection for distributors versus users. That testimony has appeared in other cases, but didn't appear in this case where the agent testified that it was for protection, but didn't specifically specify that it was users versus distributors. And obviously, both are illegal, so both might need protection. Alternatively, the court should remand for a new trial because the government elicited improper testimony from all of its witnesses. As this court has explained, the government witnesses aren't allowed to invade the province of the jury by matching what's typical in their experience to the specific facts of the case. And we have that happening with all of the government's witnesses in that case. The defense did file a motion in limine on this topic that was denied and then tried objecting again when the first witness testified, and that objection was also denied. So this argument was definitely preserved in the district court. You're doing a good job with the points that you make, but with all due respect, you're really asking us to invade the province of the jury here, to overturn the jury's decision after hearing the testimony and evidence from both sides. Yes, and on rare occasions, this court does do that. For example, in the Hunt case, the court found insufficient evidence, which I've already discussed. There's also the Harbarger case that came out, I believe, last year, where the evidence included a conclusory statement from the ATF agent that the weapon or the destructive device was designed to be a weapon. And in that case, also, the defendant had testified about his use of this weapon for blowing up beaver dams. And this court found insufficient evidence in this case. So it has happened before. I understand that it's very rare. But in this case, there just wasn't enough to allow the jury to make that rational inference that they would have to make of intent to distribute. But is it the case that the government argued the cause of the Flint flirt? They did a trial in Flint to assure that it was Yardley that the jury could find that he distributed drugs. In other words, Yardley was put forward by the government as providing the necessary link for distribution. The government briefly argued that in their closing, but then immediately said that that was not their theory of the case. And I did say a number of cases where courts have found that when there's joint acquisition of drugs for shared use, that isn't sufficient to have the intent to distribute. The Weldon case, for example, had the example of going to a McDonald's or something like that and buying hamburgers. And if one person goes up to buy the hamburgers at the counter and bring them both back, that's not distribution. So that wasn't really the government's theory. And here we do have the simultaneous possession of the drugs for them to use it. And again, we have the two pipes in Ms. Yardley's purse. You're relying on the Second Circuit for that proposition. What are the other circuits, if anything, said about this? The similar case is from the Third Circuit, and they've agreed. The Latham case is from the First Circuit, and they've also agreed. And there's Swiderisky, which I can't remember which circuit that is. So we have at least the Third, the Seventh, and the First. And in the Latham case as well, they also did have a larger quantity of drugs. They had an ounce of cocaine in that case and two people who were sharing it, which is similar to this case, where the quantity was about an ounce. With my third issue or second issue in the brief, if I could move to that, I would argue that remand is warranted for a new trial in this case because the defendant wasn't allowed to present his complete defense. All of the government's witnesses were allowed to testify, give their opinions about their experience and the quantity of drugs in this case. But the district court did not let the defense expert testify on that same topic. Mr. Ramirez would have offered testimony about his experience with people with serious drug addictions and the ways that they typically purchase and acquire their drugs and the quantities that they typically buy at a given time. And under this court's cases in Lubin and Garber, it was clear that the district court erred by allowing the government to elicit testimony on this topic, but not the defense. As another circuit has put it, what's sauce for the goose is sauce for the gander. And the government's main concern seems to be that Mr. Ramirez was relying on self-reporting of the people that he worked with, but that really goes to the weight of the evidence as opposed to its admissibility. And as far as the government's claim of harmlessness, the jury did not get to hear the complete defense. The district court granted the government's objection in part and limited Ramirez's testimony to his interactions with Mr. flirt. And, as I said, Ramirez would have testified about his experience with long term users and the quantities that they purchase. This case is similar to the Simmons case where this court rejected testimony or rejected the defendant's argument that testimony shouldn't have been admitted from a psychologist. And in that case, the psychologist had to assume that the victims were telling the truth about what happened in order to draw conclusions. And the court said that that was acceptable testimony. Again, that goes to the weight of the evidence, not its admissibility. And if the court does not have any further questions, I have reserved some time for rebuttal. Yes, thank you, Ms. Shepard. You saved time for rebuttal. All right, is it Mary or Barry? You got it right the first time, Your Honor. It's Barry. Barry? Yes. May it please the court, Loretta Barry for the United States. Viewed in a light most favorable to the jury verdict, the evidence is overwhelmingly sufficient to support distribution. This court held in Prieto Tejas that quantity alone can support distribution. Prieto Tejas involved 30 grams of cocaine. Here we have 30 grams of meth. All of the agents testified in their over 600 methamphetamine investigations. They never seen a quantity that was, in this case, that wasn't for sale. Counsel, let me ask you, since you just touched on it. Yes, sir. The third issue relates to the government's witnesses testifying. Yes. Did the government offer that testimony as a lay opinion based on experience, or were they qualified as experts in order to give that testimony? The first three witnesses that testified testified as lay witnesses based upon the fact that they were fact witnesses. The last witness was an expert witness. However, I would refer the court to Buchanan. In that case, the case discusses that because the narcotics agents were so experienced that they qualified as experts as well, Your Honor. Moving back to the sufficiency, the second big point that we have here is that this meth was in 10 individually packed bags. And this court has considered in Kane, which was even less. It was 2.5 grams, but it was broken into pieces for sale. The manner of packaging is really important. Even in Compton, the way that the packages were folded, the testimony was that that was indicative of distribution. Similarly, in Jones, in separate containers, that was indicative. But the answer to that is that that's the way it was bought because that's the way the person from whom he bought it had it packaged. Well, that could be, Your Honor. It seems to me that doesn't... You have other strong points, but not that. Well, but I think it is an important point because we're not dealing with one. We're dealing with 10 individually packed packages. And the testimony was that the user would typically only use one, but here we have 10. Moving on to the purity, which is another huge factor this court considers under Prieto-Tejas. And here we have 8 bags of 80% purity, 1 bag of 96, and 1 bag of 73. And under Prieto-Tejas, those purities were 82 and 73. Under Compton, we have 83 and 82. Let me point out that the defendant stipulated as to purity. The stipulation was in the evidence and before the jury. The jury did consider the stipulated purity. In consistent testimony, Flirt testified that he used 3.5 grams per day of methamphetamine, record 390. But then his expert testified that Flirt told him he only used 1.2 grams a day. And the expert was amazed that Flirt could even function at that amount. So the jury was entitled to hear that inconsistent testimony and discredit Flirt's testimony. The government argued that Flint and Yardley agreed to jointly possess the drugs. That is not what we argued, no, Your Honor. We argued that Flirt was buying this methamphetamine. He had presumably Yardley go in and get the methamphetamine. He was going to use it and sell the rest to feed his habit. The testimony does not support the Second Circuit's ruling in Swiderski. Let me refer the court to Speer for that question that you asked, Your Honor. In Speer, this court has never adopted that rule that the Second Circuit did in Swiderski. And the reason that the facts of Swiderski don't apply here is because the quantity is so large. It doesn't support possession just between Yardley and Flirt themselves. The quantity is so large. The packaging is individual, and there's 10 packages. But really, really important to you, Your Honor, is the fact that Yardley was not a methamphetamine addict. She was a heroin addict. Flirt testified that he had driven her multiple times to the methadone clinic to get methadone injections for her heroin addiction. In fact, on the day of his arrest, he testified that he took Yardley to the methadone clinic. So a reasonable juror could infer that she was not going to use all the methamphetamine with Flirt herself. That rule doesn't apply here. So the court doesn't need to decide whether that Swiderski rule applies. The security levels. I looked briefly at the record, and it was brief as that. The witness has never said that these security levels were high. Period. The government itself takes these amounts and offers that as argument. But that's not what's in a trial. At least that's the argument. Well, Your Honor, the defendant stipulated to that, and the jury considered the stipulation. It was in the record. The stipulation at trial was to the purity amount. So that was before the jury, Your Honor, in the written stipulation before the jury. What I'm asking about is that Yardley agreed to jointly possess the drug itself. But did you have affirmative evidence before the jury that those amounts were indicative of distribution? Absolutely, Your Honor. We did. We did. That was your lay testimony. Well, it was both. It was lay and the expert testimony. But as I mentioned in Buchanan, our lay witnesses qualify as both based on their 600 investigations. Based on the fact that all three of those witnesses in combination had 12 years of experience, 6 years of experience, and 11 years of experience. They essentially, and for all purposes under Buchanan, this court discussed that, for all intents and purposes, they qualified as experts as well. Now, they were also lay witnesses because they were fact witnesses involved personally in the investigation. Also, I want to point out with respect to your last question, Your Honor, about the joint possession, that Speer was also a 30-gram case. But Speer, again, discusses that rule that the courts never adopted it. The facts don't support it in this case.  Yardley was not a methamphetamine user. With respect to drug profiling, the law of this circuit is Speer. And Speer holds that testimony about distributable quantity, about purity, about packaging, about all of those characteristics of the exact drug evidence itself is not profiling. Because those facts allow a juror who's unfamiliar with drug evidence to infer intent to distribute. Speer explains that profiling is when there's a compilation of characteristics that's used to detect a crime, to identify the defendant, or to compare the defendant to a generic profile. It's important to remember that none of FLIRT's cases, not a single case in their opening brief or reply brief, hold that testimony about the direct evidence itself. Whether it is packaging, whether it's a distributable quantity, not a single case holds that that is profiling. And in this court's holding in DTRS Farias, which was an improper profiling case, the court cited Speer in footnote five to explain the difference between a profile, which gives generalizations about a transporter, and the difference between talking about explaining the evidence itself for the jury. So for this court to agree with the defense argument about profiling would mean that this case would be an outlier. And then it would conflict with the court's holding in Speer and all the cases thereafter that hold that those factors, that individual packaging and purity and quantity and inconsistent testimony, all of those can be considered as evidence of intent to distribute. Moving on to the constitutional question about the experts. There's no abuse of discretion in the court excluding a portion of the expert's testimony about statistics and data of self-reporting addicts. That's exactly what the court ruled on. Defense wanted the experts to testify about those facts. But the district court got it right, and here's why. If the court looks to the void dire, the court will see that the testimony simply was not reliable. At record 430, the government informed the district court that the government received the 20-page expert report, and in that report, there wasn't a single mention of data or statistics of other users. But even worse, during void dire at record 424, the prosecutor asked the expert, question, can you testify as to specific dosage amounts for an addict? Answer, no, sir. So the court got it right. The expert gave absolutely no other usage amounts, and the expert couldn't do so anyway. None of our witnesses testified about specific dosage and user amounts. We testified in general terms what a distributable quantity was in their experience. Also, the expert's testimony was internally inconsistent with Flerk's testimony as to his usage. The expert testified that he was amazed that Flerk could function 1 to 2 grams per day. That's at record 438. But later in his testimony, he's inconsistent and testifies that he's not surprised that Flerk could work at 1 to 2 grams per day. There's just no harm here because Flerk testified for the jury that he used 3.5 grams per day. All the defense cases that are cited for this expert issue, all of the government's witnesses in those cases were able to testify about a specific issue. But in this case, the defense expert was not. But in this case, none of the government's witnesses testified about specific user amounts. And the expert in this case couldn't do so anyway. He was inconsistent, and Flerk testified himself about his own usage amounts. So it would have been not only unreliable, but irrelevant. If the court has any further questions, I would respectfully request that the judge may be affirmed. Thank you, Ms. Berry. Ms. Shepherd for rebuttal. Thank you, Your Honors. With the expert testimony and complete defense argument, I would point the court to record page 195, which was the final pre-trial conference. At that point, the defense proffered what Mr. Ramirez would have testified about, which is what's typical for someone who's a long-term addict in terms of the amounts that they purchase at any given time and how they would purchase it. That came up again at record 416 to 417, where it was described as people with serious drug addictions and the ways they purchase and acquire their drugs. I would also point out that one of the government's witnesses actually testified that he didn't ask people he arrested about how much drugs they used. And he was allowed to testify despite that. And the government's arguments really go to the weight of the evidence as opposed to the admissibility. All of their witnesses were allowed to testify that in their many years of experience. For example, Officer Haywood testified, have you ever in your experience seen someone with this amount of drugs not selling it? And she said, no. And the Ramirez would have offered testimony that in his experience with more than 4000 meth addicts, he had seen the way that people purchase their drugs. And as you pointed out, Judge Smith, the way that they're packaged in this case, we don't have it's small packages. It's not the brick or the backpack full of marijuana like it is in other cases. I'd also like to discuss the spear case. In that case, the court did say that it wasn't following, but that was because there wasn't evidence in that case of actual joint acquisition of the drugs. In this case, there is evidence of joint acquisition. The government's witnesses and Mr. Flirt differed a little bit and where exactly they were when they purchased the meth. But the government, the D agent who was surveilling the drug house saw the passenger who was Ms. Yardley go into the house, quickly scurry back out to the truck. And then they left and were pulled over and had the meth. And Mr. Flirt testified that they were at a smoke shop and acquired the drugs with the same story of Miss Yardley going in. And also the fact that they had two pipes that are used to smoke meth. The government argues that Ms. Yardley was only a heroin addict, but I don't think the evidence supports that. They did, Mr. Flirt did testify that he would take her to the methadone clinic, but he also testified that if he was smoking meth, she was smoking meth. And again, the two pipes and two people and the meth pipes were actually found in his purse. As far as the purity issue, I did want to reiterate that in Prieto Tejas, that's the case where the DEA agent actually testified that the average purity of cocaine found on the street was 25% and the defendant had in his possession, 82% pure cocaine. So there, there was evidence for the jury to make that inference about the purity levels. My point about purities is not that the actual numbers were in the record, but that there wasn't any evidence for this jury to draw conclusions about those numbers. And again, in the Compton case, there were 33 grams of 82% pure meth in two bags and then 15 small bags with only 35% pure. Sorry, it wasn't meth cocaine in that case. Also, the government mentioned the cane case, but in the cane case, there were no pipes and the defendant also had been submitted to a blood test and found no evidence of cocaine in his system. So there was an absence of user evidence in that case, even though the quantity was low. And here, of course, as I've said too many times now, there were two people in a truck with two pipes that are used to smoke meth and none of those hallmarks of distribution. So if the court does not have any further questions, you would ask to remand for entry of a judgment of acquittal or to remand for a new trial. All right. Thank you, Ms. Shepard. Your case is under submission. Thank you. Next case.